**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br>LAURENCE C. CREUTZ<br><br>Debtor | Chapter 13<br>Case No. 17-11933-MSH |
| LAURENCE C. CREUTZ<br><br>Plaintiff<br><br>v.<br><br>U.S. BANK NATIONAL ASSOCIATION, as Trustee for the holders of the Asset Backed Securities Corporation Home Equity Loan Trust, Series AMQ 2006-HE7 Asset Backed Pass-Through Certificates, Series AMQ 2006-HE7,<br><br>Defendant | Adversary Proceeding<br>No. 17-01110-MSH |

**MEMORANDUM OF DECISION**

**I.    Introduction**

Laurence C. Creutz filed a voluntary petition for relief under chapter 13 of the Bankruptcy Code on May 24, 2017.[1]  During his chapter 13 case, Mr. Creutz initiated this adversary proceeding, asserting claims against U.S. Bank N.A. and Select Portfolio Services related to the

---

[1] All references to the Bankruptcy Code or Code are to 11 U.S.C. §§ 101-1532.

1

origination, underwriting and closing of his home mortgage loan.[2] By the time this proceeding was ready for trial, only a single count in Mr. Creutz's complaint against U.S. Bank remained to be litigated. This was count I in which Mr. Creutz objected to U.S. Bank's proof of claim filed in his chapter 13 case.[3] In its proof of claim, U.S. Bank asserted a claim in the amount of $470,730.01 secured by a first mortgage on Mr. Creutz's home in Weymouth, Massachusetts. At the trial, which was conducted by video due to the public health emergency created by the worldwide Covid-19 pandemic, Mr. Creutz presented his case in chief and rested. At that point, rather than presenting its case in defense, U.S. Bank orally moved for a judgment of dismissal but also rested. Subsequently, it filed a written motion for a judgment of dismissal.[4]

---

[2] All counts against Select Portfolio Services have been dismissed. *See* Mem. of Decision on Defs.' Mot. to Dismiss, ECF No. 23; Order, ECF No. 25.

[3] This adversary proceeding was commenced prior to U.S. Bank's filing of its proof of claim. The initiating pleading was labeled, "Objection to Anticipated Proof of Claim and Counterclaim," which has been construed as Mr. Creutz's complaint. U.S. Bank ultimately filed a proof of claim on October 3, 2017.

[4] U.S. Bank made this motion under a procedure that was eliminated with the 1991 amendments to the Federal Rules of Civil Procedure, which introduced in its stead the procedure for a motion for judgment on partial findings. Per the advisory committee notes on the amendment:

> Language is deleted that authorized the use of [Rule 41] as a means of terminating a non-jury action on the merits when the plaintiff has failed to carry a burden of proof in presenting the plaintiff's case. The device is replaced by the new provisions of Rule 52(c), which authorize entry of judgment against the defendant as well as the plaintiff, and earlier than the close of the case of the party against whom judgment is rendered. A motion to dismiss under Rule 41 on the ground that a plaintiff's evidence is legally insufficient should now be treated as a motion for judgment on partial findings as provided in Rule 52(c).

Fed. R. Civ. P. 41 advisory committee's note to 1991 amendment; *see also* Fed. R. Bankr. P. 7041, 7052 (applying Fed. R. Civ. P. 41, 52 in adversary proceedings). I would ordinarily thus treat U.S. Bank's motion for a judgment of dismissal as a motion for judgment on partial findings. With U.S. Bank having rested, however, both parties have been fully heard and the evidence is closed. There is no need for a judgment on partial findings. *See* Fed. R. Civ. P. 52(c). Thus, I consider U.S. Bank's motion to be moot and proceed with my findings of fact and conclusions of law based on the complete record. *See* Fed. R. Civ. P. 52(a)(1).

2

After considering the evidentiary record and the parties' written and oral submissions, I now present my findings of fact and conclusions of law.

## II. Findings of Fact

In 2006, Mr. Creutz was having trouble paying his bills. His monthly home mortgage payment to IndyMac Bank was $2,323 per month. He was carrying a number of other consumer credit obligations, including credit card debt. He was also behind on his real estate taxes. His wife had abandoned the family sometime prior to 2006, and he was left to raise their two teenaged children on his own. His salary as a mortician in a local funeral home was $47,500 annually or $3,958 per month.

Mr. Creutz began working with a mortgage broker, which he knew as Golden State Lending Group, to try to refinance his home mortgage in order to: (1) lower his monthly mortgage payment and (2) raise extra cash from the refinance to pay off his debts.[5] He truthfully and accurately disclosed to Golden State his assets and liabilities, supplying it with documents to support those disclosures, and asked Golden State to find him a mortgage loan that met his needs. Golden State agreed to do so.

Golden State worked with Mr. Creutz to put together the necessary paperwork for a loan and Golden State submitted the paperwork to Argent Mortgage Company, LLC, a mortgage lender. In doing so, Golden State falsified financial information about Mr. Creutz in a number of crucial respects. For example, Golden State submitted a false statement to Argent with Mr. Creutz's forged signature stating that any extra cash Mr. Creutz would be receiving from the

---

[5] A different name for the mortgage broker, "First Source Financial USA Inc.," is listed on the documents that were introduced into evidence. The parties, however, have stipulated that "Golden State Lending Group" was the name of the mortgage broker that assisted Mr. Creutz, and Mr. Creutz testified that he was unaware of any connection between the possibly two entities, maintaining that he worked only with Golden State.

3

refinance transaction would be to "invest in his retirement." Golden State submitted to Argent multiple loan applications on behalf of Mr. Creutz—all on identical pre-printed forms. The financial information inserted on the forms was not always the same, but each form contained materially false information. Also, not every form was signed by Mr. Creutz, and in at least one case, Mr. Creutz claims his signature was forged. Critically, the amount listed for Mr. Creutz's income on all versions of the loan application was false. Each one listed his monthly income as $6,038, which was about $2,000 a month more than Mr. Creutz told Golden State he was earning.[6] Mr. Creutz admits he did not read any of the loan applications he signed, not even the one he signed at the loan closing, and was unaware of the false information they contained until after the Argent loan had closed.

The Argent loan closed on August 25, 2006. A woman, introducing herself as working for Argent, came to Mr. Creutz's home and asked him to sign the loan documents. The two of them stood at the island in Mr. Creutz's kitchen and he signed the documents she presented to him in a folder. He did not read any of the documents or ask any questions. Argent's representative offered no explanation as to any of the documents.

Mr. Creutz borrowed $343,800 from Argent. From the loan proceeds he paid fees, points, and other charges to Argent and the mortgage broker totaling over $14,000, paid off the IndyMac loan balance of approximately $298,000, paid off a number of his consumer debts and real estate taxes totaling about $5,600, paid for title-related services and for hazard insurance,

---

[6] One loan application listed Mr. Creutz's monthly income as $4,950 (still inflated) but the number was crossed out on one of the two lines where it appeared and replaced with $6,038.

and received around $23,000 in cash.[7] His monthly mortgage payment to Argent was $2,262 ($61 less than his IndyMac payment) for the first three years based on an introductory interest rate of 7.5% per annum. The payment amount was based on a 40-year amortization schedule even though the loan matured in 30 years. After three years the interest rate would adjust every six months, never lower than 7.5% but no higher than 13.5% per annum. After ten years the principal balance would be reamortized to create a new monthly payment that would pay off the loan over the next 20 years. The adjustment features of the loan, especially the reamortization after ten years, promised to greatly increase Mr. Creutz's monthly payment amount.

When Mr. Creutz expressed his concern to Golden State that the Argent loan was unaffordable, Golden State assured him that he didn't need to keep the loan for very long. Golden State told Mr. Creutz that, having cleaned up his unpaid bills with money from the Argent loan, after a few months of on-time mortgage payments to Argent, his credit score would improve to the point where he could refinance again on more favorable terms. This turned out to be another falsehood cooked up by Golden State. When, later, Mr. Creutz asked Golden State to find him a new, more affordable mortgage loan, he was told he did not qualify for a new loan because of the lack of equity in his home.

By the end of 2006, Mr. Creutz began struggling to stay current on his Argent loan. He was in regular communication with SPS Loan Servicing, the servicer of the loan, dealing with overdue payments and exploring possible options to address the underlying reality that he couldn't afford the monthly payments. Over the next several years, Mr. Creutz and SPS representatives discussed and considered various strategies for how to deal with his payment

---

[7] The amounts listed are based upon documents other than a HUD-1 or HUD-1A Settlement Statement, as no such statement was introduced into evidence, and thus, the actual final distribution of the loan proceeds is unclear.

challenges, all while Mr. Creutz scrambled to stave off foreclosure, including using his credit cards to make mortgage payments.

In July 2010, Mr. Creutz was approved for a loan modification that considerably lowered his monthly payment, bringing it to a level he could afford. The modification did not, however, include any forgiveness of Mr. Creutz's outstanding debt. Despite being unhappy about not receiving any loan forgiveness, Mr. Creutz agreed to the modification terms, entering into a modification agreement with U.S. Bank, the successor by assignment of Argent.

No sooner had he achieved his long sought-after monthly payment relief, then a series of new crises confronted Mr. Creutz. In the fall of 2010, he was diagnosed with cancer. In early 2011, he underwent surgery preceded by radiation and chemotherapy treatment. At around the same time, the funeral home where he had been employed for over 25 years was sold, and the new owner would not agree to keep Mr. Creutz as a full-time employee. Instead, he gave Mr. Creutz sporadic, part-time work. Mr. Creutz was losing money gambling, and once again, started falling behind on his mortgage payments. He applied for social security disability assistance and, receiving retroactive approval, used the one-time lump sum benefit to catch up on his overdue mortgage payments. But after that, his monthly social security check was not enough to cover his living expenses and the mortgage payment.

Between 2011 and 2017, Mr. Creutz and SPS resumed their regular communications trying to come up with ways to help Mr. Creutz overcome his ongoing payment struggles. Ultimately, nothing could be worked out, and facing imminent foreclosure, Mr. Creutz filed his chapter 13 petition on May 24, 2017.

### III.     Legal Standard

In count I, Mr. Creutz objects to U.S. Bank's proof of claim by invoking the doctrine of

6

recoupment. Recoupment is a defense that "'permit[s] . . . judgment to be rendered that does justice in view of the one transaction as a whole.'" *United Structures of Am., Inc. v. G.R.G. Eng'g, S.E.*, 9 F.3d 996, 999 (1st Cir. 1993) (quoting *Rothensies v. Elec. Storage Battery Co.*, 329 U.S. 296, 299 (1946)). "Recoupment . . . involves a netting out of debt arising from a single transaction." *Oregon v. Harmon (In re Harmon)*, 188 B.R. 421, 425 (B.A.P. 9th Cir. 1995). As a defense, recoupment's "function is to reduce the amount demanded, but only to the extent of the plaintiff's claim." *Long Term Disability Plan of Hoffman-LaRoche, Inc. v. Hiler (In re Hiler)*, 99 B.R. 238, 243 (Bankr. D.N.J. 1989). Mr. Creutz's claim against U.S. Bank is for damages under the Massachusetts consumer protection law, often referred to as "Chapter 93A" based upon where it is codified in the Massachusetts General Laws. If Mr. Creutz can successfully carry his burden to establish U.S. Bank's liability under Chapter 93A, he can recoup his damages from U.S. Bank's secured claim, but only up to the amount of the proof of claim and no more.[8]

As is relevant here, Chapter 93A prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2(a). For a plaintiff to prevail on this type of Chapter 93A claim, four elements must be proven:

> first, that the defendant has committed an unfair or deceptive act or practice; second, that the unfair or deceptive act or practice occurred in the conduct of any trade or commerce; third, that the plaintiff suffered an injury; and fourth, that the defendant's unfair or deceptive conduct was a cause of the injury.

*See Rafferty v. Merck & Co.*, 92 N.E.3d 1205, 1223 (Mass. 2018) (internal quotation marks

---

[8] U.S. Bank argued that Mr. Creutz's claim is time barred, as the statute of limitations for such claims expired prior to the commencement of this proceeding. The defense of recoupment, however, is not subject to the statute of limitations so long as the underlying claim of the other party (here U.S. Bank) is timely. *See Bose Corp. v. Consumers Union of U.S., Inc.*, 326 N.E.2d 8, 10 (Mass. 1975); *see also May v. SunTrust Mortg., Inc.*, 7 N.E.3d 1036, 1041, 1043 (Mass. 2014).

7

omitted) (reiterating claim's elements). Whether conduct violates Chapter 93A "is a legal, not a factual, determination." *Casavant v. Norwegian Cruise Line Ltd.*, 952 N.E.2d 908, 912 (Mass. 2011) (internal quotation marks omitted). However, "whether a particular set of acts, in their factual setting is unfair or deceptive is a question of fact." *Id.* (internal quotation marks omitted).

To be found liable under Chapter 93A, the defendant's conduct generally must go beyond mere negligence. *Frappier v. Countrywide Home Loans, Inc.*, 645 F.3d 51, 59 & n.6 (1st Cir. 2011) (collecting cases). *But see Drakopoulos v. U.S. Bank Nat'l Ass'n*, 991 N.E.2d 1086, 1094 n.15 (Mass. 2013) ("We have stated repeatedly that negligence, where it results in an unfair or deceptive act, may give rise to liability under [Chapter] 93A."). A defendant can be held liable under Chapter 93A for reckless behavior. *See Kattar v. Demoulas*, 739 N.E.2d 246, 259 (Mass. 2000). "Although the Massachusetts courts have not defined recklessness in the Chapter 93A context, it suffices for these purposes to emphasize that reckless conduct embodies a 'substantially greater' degree of culpability than mere negligence." *Charles St. African Methodist Episcopal Church of Boston v. OneUnited Bank (In re Charles St. African Methodist Episcopal Church of Boston)*, 253 F. Supp. 3d 374, 383 (D. Mass. 2017) (quoting *Boyd v. Nat'l R.R. Passenger Corp.*, 845 N.E.2d 356, 363 (Mass. 2006)). Applying the reckless standard to underwriting determinations, the plaintiff must prove that based on the facts in the possession of the lender, a reasonable person would realize "that the underwriting of the loan would create an unreasonable risk of serious financial harm to the [borrower], and that such risk was substantially greater than that which is necessary to make the [lender's] underwriting of the loan negligent." *Charles St. African Methodist Episcopal Church of Boston v. OneUnited Bank (In re Charles St. African Methodist Episcopal Church of Boston)*, 574 B.R. 402, 409 (Bankr. D. Mass. 2017)

(applying *Boyd*'s reckless disregard standard).

"[A] lender may be liable under [Chapter] 93A for 'the origination of a home mortgage loan that the lender should recognize at the outset that the borrow is not likely to be able to repay.'" *Drakopoulos*, 991 N.E.2d at 1094 (quoting *Commonwealth v. Fremont Inv. & Loan*, 897 N.E.2d 548, 560 (Mass. 2008)). A combination of certain characteristics can demonstrate that the loan is presumptively unfair under Chapter 93A. These characteristics, which have come to be known as the *Fremont* factors, are:

> (1) the loans were [adjustable-rate mortgage] loans with an introductory rate period of three years or less; (2) they featured an introductory rate for the initial period that was at least three percent below the fully indexed rate; (3) they were made to borrowers for whom the debt-to-income ratio would have exceeded fifty per cent had [the lender] measured the borrower's debt by the monthly payments that would be due at the fully indexed rate rather than under the introductory rate; and (4) the loan-to-value ratio was one hundred per cent, or the loan featured a substantial prepayment penalty . . . or a prepayment penalty that extended beyond the introductory rate period.

*See Fremont Inv. & Loan*, 897 N.E.2d at 554. The existence of the first three factors significantly increases the certainty of foreclosure unless the borrower can refinance and receive a new, low introductory rate. *Id.* at 554. The last factor blocks all exits as it "would make it essentially impossible for subprime borrowers to refinance." *Id.*

Determining the existence of a Chapter 93A violation in the context of consumer mortgage loans requires analyzing whether the lender knew or should have known the mortgage was doomed to fail. In other words, the loan must be viewed through the eyes of the lender at the time it was made. *See Charles Street*, 574 B.R. at 407 (discussing that, under *Boyd*, a finding of reckless conduct includes determining that the actor must have known or had reason to know the facts which created the risk). Receiving a loan with these characteristics, however, "does not relieve a borrower of the obligation to prove that the loan was unfair or deceptive in

9

the specific circumstances in which it was made." *Charles Street*, 574 B.R. at 405 (citing *Fremont Inv. & Loan*, 897 N.E.2d at 555, 562). Again, the focus of the inquiry is whether the facts establish that "the lender should have recognized at the outset that the plaintiff[] w[as] unlikely to be able to repay the loan." *See Drakopoulos*, 991 N.E.2d at 1095. Specific circumstances to consider may include representations made between the borrower and the lender, the documents and forms conveyed to the borrower, and steps taken to verify income and other information. *See id.*; *Moronta v. Nationstar Mortg., LLC*, 41 N.E.3d 311, 316-18 (Mass. App. Ct. 2015).

Assuming a plaintiff can surmount the high hurdle of establishing unfair or deceptive acts, he must still prove actual injury. *Brown v. Bank of Am., Nat'l Ass'n*, 67 F.Supp.3d 508, 514 (D. Mass. 2014) (citing *Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 552 F.3d 47, 69 (1st Cir. 2009) (quoting *PMP Assocs., Inc. v. Globe Newspaper Co.*, 321 N.E.2d 915, 917 (Mass. 1975))). Both state and federal courts "have struggled to explain what constitutes an injury under Chapter 93A." *Shaulis v. Nordstrom, Inc.*, 865 F.3d 1, 7 (1st Cir. 2017).[9] "'[T]he unfair or deceptive act or practice must cause the consumer some kind of separate, identifiable harm arising from the violation itself.'" *Brown*, 67 F.Supp.3d at 514 (quoting *Tyler v. Michaels Stores, Inc.*, 984 N.E.2d 737, 745 (Mass. 2013)). The injury cannot involve merely the possibility or risk of harm; instead the plaintiff must establish a distinct injury. *Shaulis*, 865 F.3d at 10 (1st Cir. 2017) (citing *Bellermann v. Fitchburg Gas & Elec. Light Co.*, 54 N.E.3d 1106, 1113 (Mass. 2016)).

In certain circumstances that injury can be emotional distress. *Brown,* 67 F.Supp.3d at

---

[9] This is particularly true in *Fremont*-based Chapter 93A claims as there is a lack of a published Massachusetts opinion reviewing a *Fremont*-based Chapter 93A claim post-trial. *Charles Street*, 253 F.Supp.3d at 382 n.7.

10

514 (citing *Hershenow v. Enter. Rent-A-Car Co. of Boston, Inc.*, 840 N.E.2d 526, 533 (Mass. 2006)). To recover for emotional distress damages under Chapter 93A, the plaintiff must prove the elements of intentional infliction of emotional distress. *Hart v. GMAC Mortg. Corp. (In re Hart)*, 246 B.R. 709, 736 (Bankr. D. Mass. 2000) (citing *Haddad v. Gonzalez*, 576 N.E.2d 658, 667-68 (Mass. 1991)). This requires a showing that:

> (1) the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; . . . (2) that the conduct was extreme and outrageous . . .; (3) that the actions of the defendant were the cause of the plaintiff's distress; . . . and (4) that the emotional distress sustained by the plaintiff was severe . . . .

*Haddad*, 576 N.E.2d at 667 (alterations in original) (quoting *Simon v. Solomon*, 431 N.E.2d 556, 561 (Mass. 1982)) (internal quotation marks omitted).

Regardless of whether the injury being shown is economic or emotional, the plaintiff also must show "a causal connection between the deception and the loss and that the loss was foreseeable as a result of the deception." *Casavant*, 952 N.E.2d at 912 (internal quotation marks omitted).

It is well established under Massachusetts law that an assignee ordinarily cannot be held liable for damages based upon the acts of its assignor. *Drakopoulos*, 991 N.E.2d at 1095 n.16 (citing *Ford Motor Credit Co. v. Morgan*, 536 N.E.2d 587, 591 (Mass. 1989)). Nevertheless, under the common law principle that an assignee stands in the assignor's shoes, "assignees may be liable under [Chapter] 93A for equitable remedies such as cancellation of a debt or rescission of a contract." *Id.* In the context of this proceeding, Mr. Creutz seeks to have the claim of U.S. Bank, as assignee of Argent, reduced by recoupment in the amount of his damages caused by Argent's unfair and deceptive acts.

11

### IV. Unfair or Deceptive Act

#### a. *Fremont* Factors

Applying the *Fremont* factors to the Argent loan, I find that Mr. Creutz has successfully raised the presumption that the loan was unfair. The first *Fremont* factor is met because the Argent loan was an adjustable-rate mortgage with an introductory rate period of three years.

The second and third *Fremont* factors require an analysis based on the fully indexed rate. Often, mortgage loans, including both Mr. Creutz's IndyMac and Argent loans, provide for future interest rate adjustments based on an index that itself fluctuates. The Argent loan's interest rate after the three-year introductory period was calculated based on "the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ('LIBOR'), as published in The Wall Street Journal." Mr. Creutz's loan called for periodic interest rate adjustments based on the LIBOR but also provided that the interest rate could never exceed 13.5% per annum.

The parties presented different approaches as to how to determine Mr. Creutz's fully indexed rate for purposes of the *Fremont* test, including applying historic LIBOR rates or using the interest rate contained in the Truth in Lending Act (TILA) disclosure statement that was provided to Mr. Creutz in connection with his loan. In applying the *Fremont* factors, I conclude that the appropriate fully indexed rate on Mr. Creutz's loan is either 13.5%, the maximum interest rate permissible under the note, or 10.668%, the annual percentage rate used by Argent in the TILA disclosure statement. Either way, the fully indexed rate exceeds the introductory rate on Mr. Creutz's loan by more than 3%, and thus, the Argent loan meets the second of the *Fremont* factors.

The third factor requires a comparison between a borrower's monthly mortgage payment at the fully indexed rate and his monthly gross income. The monthly payment on Mr. Creutz's loan at the lower of the two possible fully indexed rates (10.668%) would be $3,296 and upon reamortization would be $3,549. Comparing either monthly payment to Mr. Creutz's income of $3,958 per month (or even the inflated $6,038 per month income listed in his loan applications) yields a debt-to-income ratio in excess of 50%. Thus, Mr. Creutz's loan satisfies the third *Fremont* factor.

The fourth *Fremont* factor tests the borrower's ability to refinance the loan. The reason for establishing this factor is the notion that if a loan meets the other three factors, the borrower's only hope of staving off default, when the introductory interest rate expires and the monthly payment ratchets up, is to refinance. Such loans are "'doomed to foreclosure' unless the borrower could refinance the loan at or near the end of the introductory rate period, and obtain in the process a new and low introductory rate." *Fremont Inv. & Loan*, 897 N.E.2d at 554.

The court in *Fremont* established two measures for determining the ability to refinance—analyzing the loan-to-value ratio of the loan or examining whether the loan carried a prepayment penalty. The Argent loan did not include a prepayment penalty, so I turn to its loan-to-value ratio. Argent relied on an appraisal of Mr. Creutz's home supplied by the mortgage broker. It valued the home at $382,000, which based on a loan amount of $343,800, conveniently resulted in a loan-to-value ratio of exactly 90%. For purposes of the fourth *Fremont* factor, although the loan-to-value ratio was not 100% as in *Fremont*, I find that a 90% loan-to-value ratio meets the test, given the facts of this case. The evidence establishes that Mr. Creutz entered into the Argent loan relying on Golden State's assurance that after a few months of on-time mortgage payments he could refinance on more affordable terms. Then, after having made those

payments, when Mr. Creutz asked Golden State to find him a new loan, Golden State told him he did not qualify for a refinance because he had insufficient equity in his home. In other words, the effective loan-to-value ratio of the Argent loan did not permit Mr. Creutz to refinance. Thus, Mr. Creutz's loan meets the fourth *Fremont* factor.

    **b.**     **Specific Circumstances**

Even though Mr. Creutz's loan meets the *Fremont* test, thereby establishing the presumption that the loan was unfair, it remains Mr. Creutz's burden to demonstrate that the loan was unfair as to him based on the specific circumstances under which it was made. I find that Argent's conduct in connection with Mr. Creutz's loan was reckless and that any reasonable lender would have determined that the loan created serious risk of financial harm to Mr. Creutz. Argent was presented with multiple loan applications on behalf of Mr. Creutz prior to the loan closing, at least one of which was unsigned. The loan applications contained inconsistent information, including inconsistent descriptions of Mr. Creutz's income and a handwritten alteration increasing his income by over $1,000 per month. Incredibly, Argent took no steps to independently verify Mr. Creutz's income. The Loan Approval Form prepared by Argent indicated that it had waived the requirement for proof of Mr. Creutz's income. No reasonably diligent lender would have approved the loan to Mr. Creutz without taking steps to independently verify critical financial information, particularly in light of the multiple, inconsistent loan applications. Argent failed to take such steps. I find that Mr. Creutz's loan was presumptively unfair and also unfair in the specific circumstances in which it was made.

**V.**     **Injury**

Mr. Creutz asserts that as a result of Argent's conduct he suffered injury, both economic and emotional. To establish economic damages, Mr. Creutz relied on the testimony of his

14

expert witness, Suffolk University Law School Professor Kathleen Engel. She concluded that the Argent loan cost Mr. Creutz $182,254 more in principal and interest payments than he would have paid had he stayed with the IndyMac loan. Professor Engel arrived at her number by amortizing over a 30-year term $35,854, which she calculated as the loan's "net benefit" to Mr. Creutz.[10]

Professor Engel's reasoning and hence Mr. Creutz's resulting damage claim derive from a faulty premise, namely that Mr. Creutz derived no actual benefit from the asserted $35,854 in additional monies lent by Argent.[11] In fact, Mr. Creutz benefitted greatly from the additional cash, using several thousand dollars to pay bills, including delinquent real estate taxes and keeping the remaining $23,000 to spend as he wished. Spring-boarding from this flawed premise, Mr. Creutz through his expert came up with a damage claim to $182,254 by assuming 30 years of principal and interest payments on the $35,854 figure. Mr. Creutz never paid anywhere near this amount, however. His loan was modified in 2010, reducing his interest rate and re-capitalizing substantial arrearages. It is not enough to rest only on proving an unfair act and then provide the Court with various methods to calculate speculative damages. *See Shaulis*, 865 F.3d at 10. To prevail on a claim for economic injury, the plaintiff must establish an injury that is separate, identifiable, and caused by the unfair practice or act. *Young v. Wells Fargo*

---

[10] Professor Engel arrived at the $35,854 amount by subtracting from the total Argent loan of $343,800 the amount of the original IndyMac loan ($292,000 – rather than the payoff amount of around $298,000), as well as subtracting an amount stated to have been borrowed from Argent for closing costs ($15,946).

[11] In his opposition to U.S. Bank's motion for judgment of dismissal, Mr. Creutz asserted an additional methodology for determining damages. He hypothesized that had he never refinanced with Argent but stayed with his IndyMac loan, he could have achieved a loan modification on better terms than he achieved with Argent. This is precisely the kind of speculative claim that will not qualify as damages for a Chapter 93A violation.

15

*Bank, N.A.*, 828 F.3d 26, 35 (1st Cir. 2016) (citing *Tyler*, 984 N.E.2d at 745). Mr. Creutz has failed to do so.[12]

As for emotional distress damages caused by Argent, I find that Mr. Creutz has not established those either. Mr. Creutz testified to the existence of a host of severe stresses in his life, spanning the period from 2006 through 2017, that were unrelated to the Argent loan. He bore sole responsibility for raising two teenagers because his wife had walked out on the family. His funeral home work required him to be on call 24/7. He battled cancer, suffering through chemotherapy and radiation treatments. He lost his full-time job at the funeral home. He lost money gambling.

While it is true that during much of this time Mr. Creutz struggled to make loan payments, which certainly contributed to his emotional distress, I do not find this to have been a discreet or quantifiable, never mind proximate, case of emotional distress caused by Argent. Certainly, any emotional distress experienced by Mr. Creutz as a result of the loan did not reflect a level of severity or outrageousness that would categorize it as intentionally inflicted by Argent.[13] *See Frappier v. Countrywide Home Loans*, 750 F.3d 91, 98 (1st Cir. 2014) (agreeing that plaintiff failed to prove causation when he had unpredictably been "plagued with a series of

---

[12] The damages provision of Chapter 93A establishes that "'recovery shall be in the amount of actual damages or twenty-five dollars, whichever is greater' but "does not, however, supplant the requirement that a plaintiff prove [an] injury [from an unfair or deceptive act or practice]." *Shaulis*, 865 F.3d at 13 n.5 (quoting Mass. Gen. Laws. ch. 93A, § 9(3)). Rather, "'[i]t merely eliminates the need to quantify an amount of actual damages if the plaintiff can establish a cognizable loss caused by [such an act or practice].'" *Id.* (first alteration in original) (emphasis omitted) (quoting *Hershenow*, 840 N.E.2d at 533 n.18). As already stated, Mr. Creutz has failed to do so.

[13] Mr. Creutz argues that emotional distress damages may be awarded even if the high bar of proving intentional infliction of emotional distress has not been surmounted. I find that Mr. Creutz has failed to carry his burden to prove even simple emotional distress damages.

16

serious financial difficulties"—connected to illness and hospitalization, unanticipated expenses, and changes to employment—that caused his mortgage loan default, rather than any action by defendant). On the contrary, the history of Mr. Creutz's communications with Argent's loan servicer, Select Portfolio Services, consisting of 257 pages of notes of conversations beginning in 2006, and spanning almost 12 years to 2018, portrays a loan servicer exercising considerable restraint, a willingness to explore multiple strategies to avoid foreclosure and even sympathy as to Mr. Creutz's personal and financial challenges.

### VI.     Conclusion

I find that the loan made by Argent to Mr. Creutz in 2006 was presumptively unfair based on the *Fremont* factors. As a result, Argent's conduct was unfair and deceptive in violation of Chapter 93A. Mr. Creutz, however, has failed to carry his burden to prove that he incurred injury as a result of Argent's violation, and therefore, has failed to prove an amount for recoupment in reduction of the claim asserted against him by Argent's successor, the defendant U.S. Bank. For these reasons, judgment will enter in favor of U.S. Bank. Mr. Creutz's objection to U.S. Bank's proof of claim will thus be overruled and the claim allowed in the amount filed. As indicated above, *supra* note 4, having considered this matter after both parties rested at trial, U.S. Bank's motion for a judgment of dismissal, which would be construed as a motion for judgment on partial findings, will be denied as moot.

Dated: April 12, 2021                                                        By the Court,

                                                                                            /s/ Melvin S. Hoffman
                                                                                            _____
                                                                                            Melvin S. Hoffman
                                                                                            U.S. Bankruptcy Judge